MICHAEL G. WHEAT

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
## for the
### Southern District of California

SEP 2 5 2017

CLERK, US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>1741 Oro Vista Road Apt. 248<br>San Diego, California 92154 | ) ) ) ) ) ) | Case No.<br><br>17MJ3552 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A (incorporated herein)

located in the _____ Southern _____ District of _____ California _____, there is now concealed *(identify the person or describe the property to be seized):*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18, U.S.C., Section 1546 | Fraud and Misuse of Visas, Permits and other Documents |
| Title 18, U.S.C., Section 1029 | Fraud and Related Activity in Connection with Access Devices |
| Title 18, U.S.C., Section 1028 | Fraud Related to Identification Documents |

The application is based on these facts:
See Attached Affidavit, incorporated herein by reference

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

RICARDO GIBERT, HSI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 05/26/2017 _____

_____
*Judge's signature*

City and state: San Diego, California

JAN M. ADLER, U.S. Magistrate Judge
*Printed name and title*

## **AFFIDAVIT**

I, Ricardo Gibert, being duly sworn, declare and state as follows:

### **I.   TRAINING AND EXPERIENCE**

1.   I am a Special Agent with the U.S. Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI). I am currently assigned to the HSI San Diego Document & Benefit Fraud Task Force (DBFTF), in San Diego, California. I have been employed as a federal law enforcement officer since March 2004.

2.   I have over thirteen years of experience conducting fraud investigations relating to passport and visa fraud, identity and document fraud, human smuggling/trafficking and criminal intelligence. Prior to working with HSI, I was employed with the U.S. Department of State, Diplomatic Security Service (DSS), where I held a dual commission as a DSS Special Agent and Consular Officer. I transferred to HSI in July 2011.

3.   I am a graduate of the twelve-week ICE Basic Special Agent Training Class, a twenty-six-week Basic Diplomatic Security Special Agent Training Course, and the ten-week Criminal Investigator Training Class, taught at the Federal Law Enforcement Training Center in Glynco, Georgia, and the DSS Training Center in Dunn Loring, Virginia. I am also a graduate of the U.S. Foreign Service Institute, Basic Consular Officer Course.

4.   I have received extensive training from the U.S. Department of State and ICE regarding document and benefit fraud investigations. As a Special Agent in the Document and Benefit

Fraud Task Force (DBFTF), my duties include investigating identity and document fraud, passport/visa fraud, human smuggling/trafficking and fraudulent filing of immigration petitions and applications with U.S. Citizenship and Immigration Services (CIS). These investigations routinely involve the production of counterfeit documents. I have also received extensive training and experience with the application and execution of search warrants for several types of criminal investigations, including document and benefit fraud investigations.

5. In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced in the area of document and benefits fraud, and the opinions stated below are based in part on my conversations with them. Further, I have personal knowledge of the following facts, or have had them related to me by persons mentioned in this affidavit.

6. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. Because this Affidavit is submitted for the limited purpose of establishing probable cause in support of the Application for a Search Warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and

statements described in this affidavit are related in substance and in part only.

## II.   **PROBABLE CAUSE**

7.   I make this affidavit in support of an application for a search warrant for the apartment house located at 1741 Oro Vista Road, Apartment No. 248, San Diego, California 92154, described further in Attachment A, in furtherance of an investigation into altered or fraudulent identification documents conducted by the Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations for the following target property:

a.   Altered or fraudulent identification documents, including but not limited to foreign or domestic passports, driver's licenses, and national identification documents;

b.   Altered or fraudulent immigration-related documents, including but not limited to foreign or United States issued visas, resident cards, employment authorization cards;

c.   Altered or fraudulent credit cards; and

d.   Items used to create, alter, transfer, purchase, or distribution of altered or fraudulent documents, including but not limited to computers or machines, associated documents, and financial records.

These items are further described in Attachment B.

8.   On May 11, 2017, U.S. Customs and Border Protection (CBP) at the Los Angeles Port-of-Entry (LAX) intercepted a commercial DHL package/shipment from Benin City, Nigeria, destined to 1741 Oro Vista Road, Apartment No. 248, San Diego, California 92154, a

residential address and described herein as the SUBJECT PREMISES. Using its customs authority under 19 U.S.C., §§ 482, 1467, 1496, 1581, and 1582, CBP examined the package and discovered one (1) Ghanaian passport and concluded that document was non-genuine and/or fraudulent.   The package information was as follows:

- Shipper: Eric GBADAMOSI
  10 Lheya Street Off New Lagos
  Benin City, Nigeria

- Consignee: Bismark GBEDE
  1741 Oro Vista Road, Apt. 248
  San Diego, CA 92154 (SUBJECT PREMISES)

9.    A search of U.S. Department of Homeland Security and other relevant law enforcement databases listed the SUBJECT PREMISES as the primary residence of Bismark Worlasi Kormala Gbede ("GBEDE"), who was born on April 14, 1987, in Accra, Ghana, and is a naturalized United States citizen.   The photograph on the fraudulent document (Ghanaian Passport #G1468345) recovered by CBP from the package destined to the SUBJECT PREMISES appears to me to be GBEDE.

10.    Based on my training and experience, I believe that the documents are fraudulent and are being obtained to secure a second set of identification documents that are not traceable to the person in the photograph.   The person in the photograph, GBEDE, may then use these documents to either conceal his travel or to commit further identity and access device fraud.   Based on my training and experience, including my investigations of cases involving document and benefit fraud, to include passport and visa fraud, I believe the   SUBJECT   PREMISES   contains   evidence,   fruits,   and

4

instrumentalities of violations of 18 U.S.C., § 1546(a), possession of a forged, counterfeited, altered, or falsely made, or fraudulently obtained document prescribed by statute or regulation for entry into the United States, 18 U.S.C., § 1028(a)(6), possession of an identification document or authentication feature which was stolen or produced without lawful authority, and 18 U.S.C., § 1029, fraud and related activity in connection with access devices (collectively, the "SUBJECT OFFENSES"). Based upon my experience and training, and all the facts and opinions set forth in this Affidavit, I submit this Affidavit in support of the application to search the SUBJECT PREMISES for and to seize items, for evidence of the SUBJECT OFFENSES, as specified in Attachment B.

## A. Fraudulent Document Uncovered

11.   The shipment arrived on American Airlines Flight #135 and recorded as shipment MAWB#001-44570212/HAWB#8293479563 on May 10, 2017.   The shipment was manifested as "Document," total 1 piece, valued at $1, and weighing .50kg. The package information was as follows:

- Shipper: Eric GBADAMOSI
  10 Lheya Street Off New Lagos
  Benin City, Nigeria

- Consignee: Bismark GBEDE
  1741 Oro Vista Road, Apt. 248
  San Diego, CA 92154 (SUBJECT PREMISES)

12.   The package contained one (1) Ghanaian passport (G1468345), dispensed under the name of Twumasi KWABENA, with date of birth 09/21/1990.  Based on a review of Department of Homeland

Security and other law enforcement databases, to include surveillance of the SUBJECT PREMISES, I later determined and identified that the Ghanaian passport contained a photograph of Bismark Worlasi Kormla GBEDE (DOB 04/14/1987).

13.    CBP Officer Sylvia Alvarez was assigned to the DHL Express Consignment Facility at the Los Angeles International Airport (LAX) to inspect packages coming from abroad. CBP Officer Alvarez placed the package on hold for further inspection because she has seen packages manifested as containing documents coming from Nigeria into the United States that were later found to contain fraudulent travel documents. She has witnessed this trend occurring for the past two to three years. CBP Officer Alvarez inspected the DHL package and found the aforementioned documents and identified them as follows:


- Document Information/Ghanaian Passport (1):
  Name: KWABENA, Twumasi
  Date of Birth: 09/21/1990
  Country of Issuance: Accra, Ghana
  Passport #: G1468345


14.    CBPO Alvarez then forwarded all of the documents to CBP/LAX Fraud Prevention Officer (CBP/FPO) Alejandro Dorado to examine the documents and determine whether they were fraudulent. CBP Officer Dorado has received training from CBP regarding the analysis of government issued identification documents and immigration documents, including identifying security features in these documents such as advanced printing techniques. CBP Officer Dorado has been working for CBP since 2007 and has been the primary

officer working in the secondary inspection area at the Los Angeles International Airport for fraudulent documents since January 2016. CBP Officer Dorado has reviewed at least 2,000 documents from over 100 countries to assess whether the documents are fraudulent. When determining whether a foreign document is fraudulent, CBP Officer Dorado uses known genuine samples collected and verified as genuine by CBP.

15. On May 11, 2017, CBP/FPO Dorado conducted a document fraud examination of the document found in the package destined to the SUBJECT PREMISES. Based on his training and experience, he concluded the document was either altered or fraudulent.

16. CBP/FPO Dorado found that the passport appeared to be altered because the biographic page of the passport had damage to the laminate and the binding. Also, the passport biographic page had no fine-line detail when viewed under magnification. The thread holes and stitching around center of the passport showed uneven sizes, an indication that the document had been altered or tampered with. The edges of the passport pages are not die-cut, a feature on genuine passport. In addition, the passport biographic pages lacked any background details, which are easily visible without magnification on a genuine document. The fraudulent document contained no background detail of any kind, including thin lines, an "x" like design in the upper right hand side. Based on CBP Officer Dorado's training and experience, it is possible that the fraudulent document originally contained such background details and that those background details were later erased when the document was washed to remove information of the

personal information of the person to whom the document was originally issued. Photographs depicting a genuine Ghanaian Passport and the recovered fraudulent passports are below:

### Genuine Ghanaian Passport (Left) v. Recovered Fraudulent Ghanaian Passport (Right)



### Genuine Ghanaian Passport (Left) v. Recovered Fraudulent Ghanaian Passport Under Black Light to Show Security Features (Right)



**Genuine Ghanaian Passport (Left) v. Recovered Fraudulent Ghanaian Passport Close up to Show No Fine-Line details visible under magnification (Right)**

 

**Recovered Fraudulent Ghanaian Passport Center of Passport Booklet showing non-die cut edges (Below —Close Up)**



17.     On May 22, 2017, the United States Department of State conducted records check in the Consular Consolidated Database (CCD) for the individual listed in counterfeit Ghanaian passport (#G1468345).  It searched the passport number and the biographic information listed in the counterfeit Ghanaian passport (#G1468345) found in the DHL package, which was destined for the SUBJECT PREMISES and received the following results:

- No record was found for Twumasi KWABENA with a September 21, 1990 date of birth.

- No record was found for Ghanaian Passport #G1468345

## B. Identification of the Subject

18. On May 22 and 23, 2017, other DBFTF Agents and I conducted surveillance of the SUBJECT PREMISES. During surveillance, I observed two individuals, one whom I later identified as Bismark W.K. GBEDE entering and exiting the SUBJECT PREMISES. I identified GBEDE via DHS database record checks and information provided by another federal law enforcement agency. Based on my surveillance, GBEDE lives in the SUBJECT PREMISES and closely resembles the man depicted in the aforementioned fraudulent document.

19. I further observed a 2015 dark grey four door Toyota Corolla sedan with California vehicle plate #7HHU952, which was parked in apartment complex parking lot near residential apartment number 248. A search of relevant law enforcement databases returned a vehicle registration record for CA#7HHU952 to an individual named Bismark W. GBEDE with the listed address as 1741 Oro Vista Road #248, San Diego, California 92154, the SUBJECT PREMISES. The California DMV vehicle registration record indicated that GBEDE currently had no permanent California Driver License on file with California. Another lawful enforcement database records checks showed that Illinois Driver's License #G130-0798-7107 was issued to Bismark W. GBEDE, date of birth April 14, 1987.

20. A search of U.S. Department of State (DOS), Consular Consolidated Database (CCD) revealed that the U.S. Department of

State issued a U.S. Passport on October 27, 2014, to GBEDE, with a date of birth of April 14, 1987, valid until October 26, 2024. The record also showed that on February 13, 2013, GBEDE applied for and received a diversity immigrant visa (Visa Application #143155016). DHS records show that on April 7, 2013, GBEDE entered the United States on said diversity immigrant visa (#143155016). TECS records also demonstrate that after GBEDE received his U.S. Passport, GBEDE traveled to Accra, Ghana in March 2016, and returned to the United States in April 2016.

21.     On May 22, 2017, HSI San Diego reviewed GBEDE's U.S. passport application, which indicated that he was employed with the U.S. Navy. That same day, the U.S. Naval Criminal Investigative Service (NCIS) confirmed for HSI San Diego, that GBEDE is an active duty member of the U.S. Navy stationed at the 32nd Street Naval Base in San Diego, California. GBEDE has served over three years of active duty with the Navy and holds the rank of E-4 Third Class Petty Officer. NCIS confirmed GBEDE's residence of record as 1741 Oro Vista Road Apt. 248, San Diego, California 92154, the SUBJECT PREMISES.

22.     GDEBE's U.S. Passport and U.S. Immigrant Visa photographs strongly resembles and appear to me to be the same person depicted in fraudulent Ghanaian passport (#G1468345), under the name Twumasi Kwabena, date of Birth September 21, 1990. The photographs in GDEBE's U.S. Passport and U.S. Immigrant Visa and the photograph depicting Twumasi Kwabena in fraudulent Ghanaian passport #G1468345, share similar physical features that are readily apparent to conclude that the same person is depicted. All

11

have a similar skin complexion, high hairline, similar skeletal head structure, eyebrow, similar nose bridge and high chin structure. Based on these facts, I believe that GBEDE is the same person depicted in fraudulent Ghanaian passport #G1468345.

**United States Passport Photography of**
**BISMARK WORLASI KORMLA GBEDE (circa 2014)**



**U.S. Department of State Immigrant Visa Photography of**
**BISMARK WORLASI KORMLA GBEDE (circa 2013)**



23.     Based on the facts indicated above, my training and experience, including my investigations of cases involving document and benefit fraud, to include passport and visa fraud, and information provided to me from other law enforcement officers, I believe there is probable cause to hold that SUBJECT PREMISES will contain evidence of violations of the SUBJECT OFFENSES listed above.   In addition based on my training and experience, and prior investigations I know that individuals involved in document fraud cases frequently keep in their possession documents involved in the production and distribution of counterfeit identification documents, including drafts, invoices, photographs, photocopies, and other production items and devices.   These items are frequently kept as go-byes to assist in the production of additional documents and to aid the producer in remembering the production process. There is probable cause to believe that GBEDE, who arranged to obtain fraudulent Ghanaian passport #G1468345, has other fraudulent identifications or passports stored in his residence, and other contraband that would constitute fruits, instrumentalities, and evidence of violations of the SUBJECT OFFENSES.

### III. <u>SEARCH WARRANT PROTOCOL</u>

24.     Within the allowable time prescribed by the warrant and to mitigate risk to inhabitants of the SUBJECT PREMISES, HSI Special Agents and/or other federal law enforcements officers executing the warrant will attempt to serve it while GDEBE is the only person present.   Furthermore, I have confirmed that no firearms are registered at the SUBJECT PREMISES and that GBEDE

does not have the ability to bring firearms from work to the SUBJECT PREMISES.

### IV.   PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

25.   As this application for a warrant seeks to seize physical evidence (e.g. documents) as well as electronically stored evidence (e.g. electronic messages arranging to the purchase or sale of fraudulent documents), federal agents involved in this case anticipate seizing, reviewing, and segregating responsive electronically stored information. With the approval of the Court in signing this warrant, agents executing this search warrant will employ the following procedures regarding computers and other electronic storage devices, including electronic storage media, which may contain data subject to seizure pursuant to this warrant.

### V. SEIZURE AND RETENTION OF ELECTRONICALLY STORED INSTRUMENTALITIES

26.   Based upon the foregoing, there is probable cause to believe that computers and other electronic storage devices encountered during this search may contain contraband and fruits of crime as provided at Rule 41(c)(2) of the Federal Rules of Criminal Procedure, or were used in committing crime as provided at Rule 41(c)(3), and are therefore instrumentalities of the enumerated offenses. Consequently, the computers and any other electronic storage devices are subject to seizure, retention, and possible forfeiture and destruction. Computers, other electronic storage devices, and electronic media that agents confirm onsite contain contraband, constitute fruits of crime, or have been used to commit crime will not be returned. Instead, those electronic storage devices and media will be imaged offsite and analyzed as

provided beginning at subparagraph (28) below. The onsite confirmation may be provided by an owner or user of the computer or storage device or, if feasible, may be obtained by conducting a limited onsite forensic examination to determine if the subject media contains any contraband or otherwise is an instrumentality. Computers and other electronic storage devices and media that are not confirmed onsite as instrumentalities will be taken offsite for imaging and preliminary analysis in accordance with subparagraph (27) below.

27. The offsite imaging and preliminary analysis of computers and other electronic storage devices and media to confirm their status as instrumentalities will be conducted within forty-five (45) days of seizure. Seized items confirmed to be instrumentalities will not be returned and will be further analyzed as provided below. If the preliminary analysis, by definition an incomplete or partial analysis, does not confirm that a seized item is an instrumentality, the original item will be returned promptly to its owner, absent an extension of time obtained from the owner or from the court. An image of the items will be retained and subjected to a complete forensic analysis, as provided below.

28. Computers and other electronic storage devices and media that are retained as instrumentalities will not be returned to the owner. The owner will be provided the name and address of a responsible official to whom the owner may apply in writing for return of specific data not otherwise subject to seizure for which the owner has a specific need. The identified official or other representative of the seizing agency will reply in writing. If the

owner's request is granted, arrangements will be made for a copy of the requested data to be obtained by the owner. If the request is denied, the owner will be directed to Rule 41(g) of the Federal Rules of Criminal Procedure.

## VI. IDENTIFICATION AND EXTRACTION OF RELEVANT ELECTRONICALLY STORED DATA

29.   A forensic image is an exact physical copy of the hard drive or other electronic storage media. After obtaining a forensic image, the imaged copy will be analyzed to identify and extract data subject to seizure pursuant to this warrant. Analysis of the data following the creation of the forensic image can be a highly technical process requiring specific expertise, equipment, and software. There are thousands of different hardware items and software programs, and different versions of the same programs, that can be commercially purchased, installed, and custom-configured on a user's computer system.   Computers are easily customized by their users.  Even apparently identical computers in an office environment can be different with respect to configuration, including permissions and access rights, passwords, data storage, and security.  It is not unusual for a computer forensic examiner to have to obtain specialized hardware or software, and train with it, in order to view and analyze imaged data.

30.   Analyzing the contents of a computer or other electronic storage device, even without significant technical challenges, can be very challenging.  Searching by keywords, for example, often yields many thousands of hits, each of which must be reviewed in

its context by the examiner to determine whether the data is within the scope of the warrant.  Merely finding a relevant hit does not end the review process for several reasons.  The computer may have stored metadata and other information about a relevant electronic record – e.g., who created it, when and how it was created or downloaded or copied, when it was last accessed, when it was last modified, when it was last printed, and when it was deleted. Keyword searches may also fail to discover relevant electronic records, depending on how the records were created, stored, or used.  For example, keywords search text, but many common electronic mail, database, and spreadsheet applications do not store data as searchable text.  Instead, the data is saved in a proprietary non-text format.  Documents printed by the computer, even if the document was never saved to the hard drive, are recoverable by forensic programs because the printed document is stored as a graphic image.  Graphic images, unlike text, are not subject to keyword searches.  Similarly, faxes sent to the computer are stored as graphic images and not as text.  In addition, a particular relevant piece of data does not exist in a vacuum.  To determine who created, modified, copied, downloaded, transferred, communicated about, deleted, or printed the data requires a search of other events that occurred on the computer in the time periods surrounding activity regarding the relevant data.  Information about which user had logged in, whether users share passwords, whether the computer was connected to other computers or networks, and whether the user accessed or used other programs or services

in the time period surrounding events with the relevant data can help determine who was sitting at the keyboard.

31.  It is often difficult or impossible to determine the identity of the person using the computer when incriminating data has been created, modified, accessed, deleted, printed, copied, uploaded, or downloaded solely by reviewing the incriminating data. Computers generate substantial information about data and about users that generally is not visible to users.  Computer-generated data, including registry information, computer logs, user profiles and passwords, web-browsing history, cookies and application and operating system metadata, often provides evidence of who was using the computer at a relevant time.  In addition, evidence such as electronic mail, chat sessions, photographs and videos, calendars and address books stored on the computer may identify the user at a particular, relevant time.  The manner in which the user has structured and named files, run or accessed particular applications, and created or accessed other, non-incriminating files or documents, may serve to identify a particular user.  For example, if an incriminating document is found on the computer but attribution is an issue, other documents or files created around that same time may provide circumstantial evidence of the identity of the user that created the incriminating document.

32.  Analyzing data has become increasingly time-consuming as the volume of data stored on a typical computer system and available storage devices has become mind-boggling.  For example, a single megabyte of storage space is roughly equivalent to 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000

megabytes, is roughly equivalent to 500,000 double-spaced pages of text.   Computer hard drives are now being sold for personal computers capable of storing up to 2 terabytes (2,000 gigabytes) of data.   And, this data may be stored in a variety of formats or encrypted (several new commercially available operating systems provide for automatic encryption of data upon shutdown of the computer).   The sheer volume of data also has extended the time that it takes to analyze data.   Running keyword searches takes longer and results in more hits that must be individually examined for relevance.   And, once reviewed, relevant data leads to new keywords and new avenues for identifying data subject to seizure pursuant to the warrant.

33.   Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including the use of hashing tools to identify evidence subject to seizure pursuant to this warrant, and to exclude certain data from analysis, such as known operating system and application files.   The identification and extraction process may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within one-hundred twenty (120) days from the date of seizure pursuant to this warrant, absent further application to this court.

34.   All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

## VII. GENUINE RISK OF DESTRUCTION OF DATA

35.   Based upon my experience and training, and the experience and training of other Agents with whom I have communicated, it is not uncommon for technically sophisticated criminals to use encryption, programs to destroy data that can be triggered remotely or by a pre-programmed event or keystroke and sophisticated techniques to hide data.

## VIII.   PROCEDURES FOR ELECTRONICALLY STORED INFORMATION FROM CELL PHONES AND MOBILE DEVICES

36.   It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device.   Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing.   An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device.   For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network.   Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device.   Current technology provides some solutions for acquiring some of the data

stored in some cellular telephone models using forensic hardware and software.  Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired.  For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography.  This process is time and labor intensive and may take weeks or longer.

37.  Following the issuance of this warrant, I will collect the subject cellular telephone and subject it to analysis.  All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

38.  Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## VIII.   CONCLUSION

39.  In conclusion, I believe that probable cause exists to search the SUBJECT PREMISES for evidence that the SUBJECT OFFENSES were committed because GBEDE lives at the SUBJECT PREMISES and the package was addressed to the SUBJECT PREMISES.  The individual

depicted in the fraudulent Ghanaian passport in the aforementioned package appear to be GBEDE. Furthermore, GBEDE was born in Accra Ghana, which is a close neighboring country to Nigeria from which the aforementioned package was sent. I believe that GBEDE may attempt to use this altered or fraudulent document to conceal his travel. Alternatively, GBEDE may use these altered or fraudulent documents to engage in identity or credit card fraud. The package destined for the SUBJECT PREMISES includes a foreign passport with what appears to be his photograph, which would facilitate the commission of access device and identification fraud.

40. For all the reasons described above, including the similar appearance of a SUBJECT PREMISES' resident to the fraudulent document being sent to the SUBJECT PREMISES, there is probable cause to believe that the items listed in Attachment B, which constitute fruits, instrumentalities, and evidence of violations of the SUBJECT OFFENSES will be found at the SUBJECT PREMISES, as described in Attachment A.

RICARDO GIBERT, Special Agent
Homeland Security Investigations
Department of Homeland Security

Subscribed to and sworn before
me this 26th day of May 2017.

JAN M. ADLER
U.S. MAGISTRATE JUDGE